# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JANUARY 21, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0630-WC

MEGAN SHOEMAKER                                            APPELLANT


                    ON APPEAL FROM COURT OF APPEALS
v.                               NO. 2019-CA-0039
                     WORKERS' COMPENSATION BOARD
                        NO. 17-WC-99744


KELLY SERVICES, INC.; HON. JOHN                  APPELLEES
H. MCCRACKEN, ADMINISTRATIVE
LAW JUDGE; AND WORKERS'
COMPENSATION BOARD


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Megan Shoemaker appeals from the Court of Appeals' decision upholding an Administrative Law Judge's (ALJ) denial of her claims for temporary total disability benefits and medical benefits relating to her cervical surgery. Shoemaker argues that the ALJ erred by making findings not supported by substantial evidence, and misinterpreted Kentucky law regarding cumulative and acute trauma injuries. Because the ALJ's findings actually were supported by substantial evidence, and the distinction between cumulative and acute injuries is immaterial to the resolution of Shoemaker's claims, we disagree with Shoemaker. For the reasons stated below, we affirm the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

Megan Shoemaker worked for Kelly Services, Inc., a job placement company, from March 4, 2015 until November 13, 2016, and worked throughout that time at Toyota Manufacturing, Inc. She had been employed for approximately eleven months at the time of her February, 2016 injury. She was hired by Toyota and began working as a Toyota employee on November 14, 2016. She worked approximately 40-50 hours per week and her job required her to operate a forklift and a tugger. While operating the forklift she delivered parts to specific lanes at the Toyota facility, and was not required to manually pick up any parts. While working the tugger job she had to physically cut plastic, flip lids and organize materials, which required her to lift, twist and bend. She stated that some of the materials were heavy but could not approximate a weight range. At each delivery stop, she manually took products off the tugger and left them at the delivery location.

On February 22, 2016, she was operating on the U Lane and described it as heavy work. She was working overtime with no break and stated it was hard to lift the boxes and stay on time, so she began to slow down. The job she was working that day required a lot of lifting and moving. While working, her "traps" (trapezius muscle) began to tighten and her arms got tired. She finished her shift and went home. She was lying on the couch and leaned up to grab her puppy. When she made a quick turn of her neck, she felt her neck lock up and also experienced a significant increase in pain.

2

The next morning Shoemaker sought treatment at Toyota's medical facility. On the intake form she stated that she had neck and shoulder blade spasms that resulted from moving too fast after her muscles were fatigued. The APRN diagnosed her with a neck muscle strain and recommended ice, ibuprofen or Tylenol, and gentle stretching and self-massage. She was placed on work restrictions which required her to sort parts. She sought treatment with her primary care physician who prescribed muscle relaxers. Toyota would not allow her to work while taking muscle relaxers, so she was off work for a few days. Shoemaker testified that during her time off her symptoms improved.

In a follow-up appointment with the Toyota medical facility on February 29, 2016, the same APRN noted Shoemaker's complaints, but stated that Shoemaker was doing better, had increased her range of motion and decreased pain. On March 21, 2016 Shoemaker denied any pain, numbness, tingling or swelling. She was allowed to return to work with reintroduction for two days, then regular full duty work. A week later she reported no issues or complaints during a follow-up visit and said she was doing well. Shoemaker had a full range of motion without pain or tenderness. She was released to full duty and advised to return as needed. During her deposition Shoemaker testified that over the next several months between March and November, her symptoms intermittently recurred but were manageable.

Shoemaker began receiving treatment from Dr. Rice on January 20, 2017 and she reported neck and right upper extremity pain. Dr. Rice noted

3

decreased strength and reflex and placed her on a ten-pound weight restriction. On February 16, 2017 she had an epidural steroid injection that she said made her symptoms worse. Dr. Rice diagnosed herniated discs at C5-C6 after reviewing an MRI. He noted during a visit on March 10, 2017 that Shoemaker reported persistent pain and that she was having trouble working at Toyota. Because all conservative treatment options had failed, Dr. Rice recommended a discectomy with cervical disc replacement at C5-C6. Shoemaker saw Dr. John Vaughan for a second opinion on March 30, 2017. He also noted a two-level disc herniation at C5-C6 and C6-C7. Dr. Vaughan also believed surgery was a good option for Shoemaker, but provided other treatment options, like physical therapy.

Shoemaker's last day of work at Toyota was April 12, 2017. She filed a claim for workers' compensation benefits on May 2, 2017, claiming repetitive motion injuries to multiple body parts that occurred on February 22, 2016.[1]

During a June 9, 2017 visit with Dr. Rice, Shoemaker reported new left-sided symptoms that went into her neck and trapezius down to her arm. During this visit Shoemaker had an MRI to make sure she was still a candidate

---

[1] Shoemaker stated that approximately one week before December 2, 2016, her previously manageable symptoms grew increasingly worse to the point where she could not get relief. She ultimately sought medical treatment at Toyota's medical facility on December 2, 2016. She testified that the symptoms were so bad that she tried to seek treatment from her family doctor but was unable to be seen so she went to the hospital. She was referred to a specialist, Dr. James Rice. Shoemaker filed a repetitive motion claim against Toyota with a disability manifestation date of December 2, 2016 and this claim was settled prior to the Final Hearing. Therefore, the claim against Toyota is not before the Court in this appeal.

for cervical surgery. After review, Dr. Rice concluded that a decompression procedure with a discectomy and fusion was an appropriate treatment option.

On August 18, 2017 Dr. Rice performed the cervical fusion surgery. During a follow up appointment, she reported having some tingling and numbness in her upper extremity, but that her pain overall had improved. Generally, Dr. Rice noted that Shoemaker was doing well but he recommended maintaining lifting restrictions and limiting overhead activity. During a follow up appointment on September 22, 2017 Shoemaker reported a lot of pain in her shoulder blade and a stiff neck but stated that she did not have any arm pain. On October 20, 2017 Shoemaker reported right arm numbness and tingling, stiffness in her neck and back upon waking up, and back pain. She reported that she had trouble standing for any period of time and believed her symptoms were work-related. Dr. Rice recommended home exercises for her low back and to continue using the anti-inflammatory and muscle relaxant medication she had taken in the past. Overall, regarding her cervical spine surgery, Dr. Rice stated that Shoemaker was "doing as expected."

Shoemaker underwent several medical evaluations at both her attorney's and Kelly Services' requests. Dr. Philip Corbett evaluated Shoemaker on behalf of Kelly Services on November 27, 2017 and concluded that the episode from which her problems developed occurred at home, not at work. He opined that there was no traumatic pathology in Shoemaker's right shoulder and noted that there was evidence of radiculopathy at the C5-C6 and C6-C7 levels. He also stated that further surgical intervention may be necessary at the C7 level.

5

Dr. Corbett opined that if Shoemaker is at MMI, no work restrictions are necessary but that whether she reached MMI was arguable since further surgical intervention could be necessary.

Kelly Services filed the medical report of Dr. Rafid Kakel who conducted an IME on December 21, 2017. Shoemaker reported neck pain that radiated into her right arm. Dr. Kakel reviewed her symptom history and past medical treatment, including the cervical MRI studies. Dr. Kakel diagnosed her with disc protrusions at C5-C6 and C6-C7. He stated that the only conditions she has that are causally related to her work for Kelly Services are the cervical and right shoulder strain. He opined that her work activities with Kelly Services were not ones that would cause her to have cervical spinal disc protrusions. Dr. Kakel noted the gap in treatment from March to December 2016 and that the disc changes at more than one level were more consistent with naturally occurring changes rather than with changes occurring from work activities or injury. He specifically stated that there was no causal relationship between the cervical surgery and Shoemaker's employment with Kelly Services.

Dr. Kakel concluded that Shoemaker has no functional impairment that is causally related to her employment at Kelly Services. He opined that Shoemaker had a 25% impairment rating because of the cervical surgery regardless of causation. He also reviewed Dr. Vaughan's January 2018 report and issued an addendum report dated December 21, 2017. Dr. Kakel disagreed with Dr. Vaughan's opinion as to causation and noted that Dr. Vaughan failed to consider the alleged mechanism of injury or gap in treatment

6

when forming his opinion. He also opined that the February 2017 MRI findings, relied on by Dr. Vaughan, were far too removed from the date of injury to be causally related.

Dr. Vaughan evaluated Shoemaker at the request of her attorney on January 22, 2018. He obtained a history that Shoemaker developed neck pain with pain radiating into her right arm with numbness following the February 22, 2017 incident. According to Dr. Vaughan, there was no evidence of pre-existing active conditions, and a very clear history of causation. He diagnosed a herniated disc at C5-C6 and status post anterior cervical discectomy and fusion at C5-C6. He attributed both diagnoses to the work incident and noted that all healthcare providers stated that her symptoms began with the work injury. He placed Shoemaker at MMI on February 18, 2018, which was six months after her surgery. Dr. Vaughan assessed a 27% impairment rating and recommended work restrictions that would preclude her from returning to work at Toyota. He did not anticipate a need for further surgical treatment.

In an addendum report on April 11, 2018, Dr. Vaughan stated that he reviewed Dr. Corbett's report and disagreed regarding causation. During both of Dr. Vaughan's visits with Shoemaker, initially for a second opinion on March 30, 2017 and again for the IME on January 22, 2018, Shoemaker made no mention of the incident with her puppy. After reviewing Shoemaker's deposition, Dr. Vaughan noted that it was clear that Shoemaker's neck and arm pain began with her work at Toyota on February 22, 2016 and was merely exacerbated when she reached for her dog and felt her neck lock up. Dr.

Vaughan did not believe that this type of reaching episode caused any significant stress on the cervical spine and could not cause this type of injury.

Dr. Henry Tutt examined Shoemaker on April 13, 2018 and reviewed Shoemaker's deposition testimony and treatment records. He opined that Shoemaker sustained a cervical strain or sprain because of the February 22, 2016 work incident which resolved no later than March 28, 2016 with restricted duty, physical therapy and the passage of time. Dr. Tutt noted that Shoemaker clearly suffered an increase in symptoms after sitting up on her couch and reaching for her dog. Dr. Tutt stated that following the February 22, 2016 incident Shoemaker became completely asymptomatic and reached maximum medical improvement (MMI) no later than March 28, 2016. He opined that Shoemaker did not have an impairment rating and did not require work restrictions because of the February 22, 2016 injury. Because of the cervical surgery, Dr. Tutt assessed an impairment rating of 25%, but noted that this impairment rating has no relationship to the alleged work injury on February 22 or to any workplace activities at Toyota. He believed the disc herniation that led to the cervical surgery was spontaneous.

Dr. Kakel prepared an addendum to his IME on April 18, 2018. Dr. Kakel reviewed Dr. Vaughan's IME report and opined that Dr. Vaughan did not take the mechanism of injury or gap in treatment into consideration when forming his opinions. Dr. Kakel criticized Dr. Vaughan for relating Shoemaker's cervical condition to her work injury primarily because she did not have any pre-existing neck injuries or conditions. He again highlighted the

8

fact that Shoemaker's condition improved with treatment and her return to her regular job. He also reiterated that there was a gap in treatment, which is consistent with a sprain.

A final hearing was held on May 21, 2018. Shoemaker testified that as of that date she experienced stiffness in the mornings and occasionally her neck locks up. The more active she is, the more her symptoms flare up. Her neck injury affects her range of motion and at times causes pain to radiate down her right arm. Although she still performs daily tasks, she must take breaks and does not lift anything heavy. In his July 18, 2018 Opinion and Order, the ALJ found that Shoemaker failed to meet the burden of proving that she sustained anything more than a temporary injury while employed at Kelly Services. The ALJ noted that Shoemaker did not testify that lifting any particular part caused her injury. Relying on the opinions of Dr. Kakel and Dr. Tutt, the ALJ concluded that Shoemaker suffered a temporary cervical strain/sprain and right shoulder strain injury that resolved on March 28, 2016, the date she reached MMI and returned to her regular duty work.

Additionally, the ALJ relied on Drs. Kakel and Tutt in concluding that the gap in time between March 28, 2016 and December 2, 2016 was sufficient to terminate any nexus between the original February 22 work injury and her subsequent cervical surgery. The ALJ dismissed Shoemaker's claim for permanent partial disability benefits because she did not sustain a permanent injury. He also dismissed her claim for temporary total disability benefits

because she did not miss more than seven days of work, but awarded medical benefits from February 22, 2016 to March 28, 2016.

Shoemaker filed a petition for reconsideration arguing that the ALJ misinterpreted Dr. Vaughan's report, and that the reports of Dr. Kakel and Dr. Tutt did not constitute substantial evidence. The ALJ denied the petition on August 15, 2018, stating that Shoemaker was rearguing her case and explaining that while he found that Shoemaker sustained a work-related injury, it was temporary and not permanent in nature. Further, the ALJ explained that the gap in time between the date of the injury and Shoemaker's cervical surgery was too long to relate the cervical surgery to the work injury.

Shoemaker appealed to the Workers' Compensation Board (Board). In an opinion rendered December 7, 2018, the Board found that there was substantial evidence to support each of the ALJ's findings. Further, the Board rejected Shoemaker's argument that the ALJ was not fully aware of Dr. Vaughan's opinions, and noted that the ALJ was not required to rely on Dr. Vaughan's opinions. The Board determined that the opinions of Dr. Kakel and Dr. Tutt that Shoemaker sustained only a temporary injury constituted substantial evidence and are supported by the Toyota medical records and Shoemaker's testimony. The Board affirmed the ALJ's Opinion and Order and the August 15, 2018 Order on Reconsideration.

In an opinion rendered September 27, 2019 the Court of Appeals affirmed the Board, agreeing that the ALJ's assessment of the evidence was supported by substantial evidence and not clearly erroneous. Noting the

10

function of its review is to correct the Board only where it committed an error in assessing the evidence so flagrant as to cause gross injustice, *W. Baptist Hosp. v. Kelly,* 827 S.W.2d 685, 687-88 (Ky. 1992), the Court of Appeals determined that the Board did not err by affirming the ALJ's opinion. The Court of Appeals noted its difficulty in understanding how a 23-year-old employee with no history of degenerative cervical conditions could spontaneously develop such a dramatic injury, but reluctantly affirmed the Board. Shoemaker appealed to this Court, arguing that the opinions of Dr. Kakel and Dr. Tutt cannot constitute substantial evidence, that the ALJ misinterpreted the law, and that the ALJ denied her claim based on findings that are factually inaccurate.

### ANALYSIS

The ALJ, as fact-finder, has the sole authority to determine the quality, character and substance of the evidence. *Square D Co. v. Tipton,* 862 S.W.2d 308, 309 (Ky. 1993). "A party who fails to meet its burden before the ALJ must show on appeal that the unfavorable finding was clearly erroneous because overwhelming evidence compelled a favorable finding, *i.e.,* that no reasonable person could have failed to be persuaded by the favorable evidence." *Kroger v. Ligon,* 338 S.W.3d 269, 273 (Ky. 2011). "[T]he ALJ's findings of fact are entitled to considerable deference and will not be set aside unless the evidence compels a contrary finding." *Finley v. DBM Technologies,* 217 S.W.3d 261, 264 (Ky. App. 2007). The ALJ awarded Shoemaker medical benefits from February 22, 2016 through March 28, 2016 but denied her claim for permanent income benefits

11

and temporary total disability benefits. Therefore, Shoemaker must prove that "overwhelming evidence compelled" a finding in favor of permanent income benefits and temporary total disability benefits. *Kroger*, 338 S.W.3d at 273.

In awarding benefits, the ALJ relied primarily on the medical opinions of Dr. Kakel and Dr. Tutt, who both concluded that Shoemaker's injury was temporary and there was no causal connection between the injury and the cervical surgery. Shoemaker points to the ALJ's conclusion that the gap in time between March 28, 2016 and December 2, 2016 is sufficient to terminate any nexus between the original injury and her subsequent cervical surgery and argues that because she was seen at KentuckyOne Primary Care Associates on April 27, 2016, the ALJ's opinion is based on a factual finding that is clearly erroneous. Despite references to the April 27 visit in the IME reports, there is no record of the April 27, 2016 appointment with KentuckyOne Health in evidence. The ALJ could not consider evidence that was not in the record, although several of the physicians who examined her referred to an April 27 visit in their reports. If this particular treatment note was important for the ALJ's consideration, then Shoemaker should have made it part of the record. In any event, even if the April 27 office note was in the record, there still would have been a gap in treatment from April 27 to December 2—more than seven months.

The ALJ recognized Shoemaker's testimony that she continued having problems a few weeks after she returned to work on March 28, 2016. However, the ALJ highlighted the fact that Shoemaker did not present these problems to

12

anyone at Kelly Services or Toyota. Shoemaker argues that she is not required to re-report her injury when her symptoms recurred, which is correct. However, nothing prohibits the ALJ from considering this fact in determining whether disability benefits are appropriate. The fact that Shoemaker did not report any symptoms to her employers is consistent with the gap in treatment and obviously suggests that her symptoms resolved.

Shoemaker also argues that Dr. Kakel and Dr. Tutt ignored evidence and gave no explanation as to how Shoemaker could have reached MMI on March 28, 2016, then experienced the same previously reported symptoms on April 27, 2016. Although there was evidence to support a different finding, the ALJ, as fact finder, has the sole authority to determine the weight, credibility, substance and inferences to be drawn from the evidence. *Paramount Foods, Inc. v. Burkhardt,* 695 S.W.2d 418, 419 (Ky. 1985). Again, to prevail on appeal Shoemaker must show that "overwhelming evidence compelled" a finding in her favor. *Kroger,* 338 S.W.3d at 273. The evidence contrary to the ALJ's findings was not overwhelming and the ALJ's conclusions were reasonably supported by the medical evidence. "[A] finding which can reasonably be made is, perforce, not clearly erroneous. A finding which is unreasonable under the evidence presented is 'clearly erroneous' and, perforce, would 'compel' a different finding." *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986).

In his opinion, the ALJ stated that he relied on Shoemaker's testimony as well as the medical reports of Dr. Kakel and Dr. Tutt in determining that Shoemaker's injury was temporary and that no nexus existed between the

13

cervical surgery and the work injury. Much of the evidence suggests that Shoemaker sustained a temporary work injury and it was entirely reasonable for the ALJ to reach that conclusion. The Board specifically noted that the ALJ's conclusions were consistent with Shoemaker's deposition testimony and her Toyota medical records. The Court of Appeals likewise held that the ALJ did not commit error in assessing the evidence. We agree.

Shoemaker cites *Cepero v. Fabricated Metals Corp.,* 132 S.W.3d 839 (Ky. 2004), arguing that a medical opinion based on a corrupt history cannot constitute substantial evidence. However, in *Cepero* the workers' compensation claimant himself neglected to provide substantial information to his examining physicians regarding a major injury to the same injured body part prior to the work injury. The opinions of Dr. Kakel and Dr. Tutt were not corrupted in that fashion. Dr. Tutt reviewed all medical records, and the IME reports of Dr. Kakel and Dr. Vaughan, as well as Shoemaker's deposition testimony. Dr. Kakel reviewed Shoemaker's medical records and considered the information she provided during the examination. He also reviewed two MRI studies of Shoemaker's cervical spine. We cannot say that either of these physicians cited incomplete or inaccurate information. Both physicians were aware of Shoemaker's medical history and formed their opinions based on several sources of information. Therefore, these opinions constitute substantial evidence and the standard to reverse the ALJ's findings on appeal has not been met.

14

Dr. Kakel stated that Shoemaker "went several months without the need for any formal treatment from March 2016 to December 2016." Even though Shoemaker apparently sought treatment at KentuckyOne Primary Care Associates on April 27, 2016 (again, no medical record substantiating this is in the record), this isolated statement by Dr. Kakel does not render his entire examination and report inaccurate. It is unclear what constitutes "formal treatment," and we cannot conclude that this statement constitutes inaccurate or incomplete information. Further, in the list of "Records Review" Dr. Kakel lists that he reviewed the records of Nikita Sutton, APRN. Although the April 27 KentuckyOne record is not available, Dr. Tutt noted that during that visit, Nikita Sutton, APRN recommended an MRI. It is possible that Dr. Kakel reviewed the missing record, and merely overlooked the fact that Shoemaker sought treatment on that date in concluding that she did not need formal treatment between March 2016 and December 2016. We also note that Shoemaker failed to inform Dr. Kakel about the incident at home with her puppy on the evening of February 22, 2016, an incident which other physicians believed to be a potential cause of her February 22 injury.

Shoemaker also argues that the ALJ misinterpreted the law regarding single trauma and cumulative trauma injuries and did not properly consider whether Shoemaker had a cumulative trauma injury. In her view, the ALJ's misinterpretation of the law caused him to reject Dr. Vaughan's opinion without proper consideration.

In his opinion, the ALJ stated

15

Miss Shoemaker pled the case, and has testified, that her injury occurred because of the repetitive motion caused by the fast pace movements required in the tugging portion of her job. This job required her to lift parts that she stated were heavy. However, she had been at this job for just under a year when she complained of her neck and right shoulder spasms and pain. She has not testified to lifting any specific part that caused a traumatic incident that produced her symptoms. . . . There is a difference in the required proof for a cumulative trauma claim as opposed to an acute trauma claim.

The ALJ did not misinterpret the law pertaining to cumulative trauma and acute trauma injuries, and regardless, this distinction is irrelevant in this case because absolutely no medical evidence supported a cumulative trauma claim. None of the physicians who conducted an IME concluded that Shoemaker suffered a cumulative trauma injury. Dr. Kakel labeled Shoemaker's temporary injury as "acute," and Dr. Vaughan attributed Shoemaker's symptoms to the single work injury on February 22. Dr. Tutt attributed Shoemaker's cervical strain to the single work incident, and Dr. Corbett opined that "the episode" for which her problems developed occurred at home, not in the workplace.

Despite Shoemaker's deposition testimony that arguably suggested a cumulative trauma injury and her description on her initial workers' compensation claim forms that she suffered a cumulative trauma injury, no physician opined that her injuries were cumulative. Each physician pointed to her work on February 22 as a basis for her complaints, and the ALJ relied on these opinions in concluding that Shoemaker sustained a temporary injury. In *Robertson v. United Parcel Service,* 64 S.W.3d 284, 286 (Ky. 2001), the Court reviewed temporary versus permanent disability benefits. "[I]n order to qualify

16

for an award of permanent partial disability under KRS 342.730, the claimant was required to prove not only the existence of a harmful change as a result of the work-related traumatic event, he was also required to prove that the harmful change resulted in a permanent disability as measured by an AMA impairment." *Id.* Therefore, a claimant can suffer a temporary work-related injury, but fail to prove a permanent injury. The ALJ's opinion makes it clear that the only harmful change Shoemaker experienced because of the work-related injury was temporary in nature. Any other conditions which necessitated the cervical surgery were not work related. The ALJ properly relied on the medical evidence in the record in reaching his conclusions.

"Although a party may note evidence which would have supported a conclusion contrary to the ALJ's decision, such evidence is not an adequate basis for reversal on appeal." *Ira A. Watson Dept. Store v. Hamilton,* 34 S.W.3d 48, 52 (Ky. 2000) (citing *McCloud v. Beth-Elkhorn Corp.,* 514 S.W.2d 46 (Ky. 1974)). While there is conflicting medical evidence in the record, Shoemaker must demonstrate that the evidence was so overwhelming as to compel a favorable finding. *Kroger,* 338 S.W.3d at 273. She failed to do so. Therefore, the ALJ did not err in denying her claim for permanent disability benefits.

## **CONCLUSION**

The ALJ did not misconstrue the evidence or ignore Shoemaker's legal arguments. The determination that Shoemaker suffered a temporary injury was supported by her deposition testimony and the medical records.

17

Accordingly, we affirm the Court of Appeals decision affirming the Board and upholding the ALJ's opinion and order.

Minton, C.J.; Conley, Hughes, Lambert, Nickell, and VanMeter, JJ., concur.  Keller, J., concurs in result only.


COUNSEL FOR APPELLANT:

Jackson Wayne Watts


COUNSEL FOR APPELLEE,
KELLY SERVICES, INC.

Rodney Joseph Mayer